UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CHRISTOPHER LANE,
KRISTOPHER KRAS, and
TIMMY LURZ,

      Plaintiffs,

      v.          07-CV-3332

LARRY PHILLIPS,
EUGENE MCADORY, and
SHAN JUMPER

      Defendants.

## Order

      The plaintiffs, detained at the Rushville Treatment and Detention Center ("Rushville") pursuant to the Illinois Sexually Violent Persons Act, pursue claims regarding their access to the courts and their ability to associate and communicate with each other. On March 10, 2010, the court granted summary judgment to the defendants on the access claim by the plaintiffs Lane and Kras. Summary judgment was also granted to the defendants on the plaintiffs' challenge to the restriction on interaction between residents held in different units. After that ruling, the court recruited Jerold S. Solovy, Esq.[1] and the law firm, Jenner & Block, to represent the plaintiffs on the remaining claims. The court thanks Jenner & Block for its outstanding pro bono representation and service to the court.

      Now before the court are the defendants' motions for summary judgment on the remaining claims, and the plaintiffs' motion to reconsider the court's order granting summary judgment on the unit-interaction claim.

      The court will grant the defendants' summary judgment motions. In sum, while Rushville does not appear to provide the resources necessary to help illiterate residents access the courts, the plaintiff Lurz, who is functionally illiterate, cannot demonstrate that he suffered actual prejudice from that failure. On the written communications claims, the record now shows that the residents are able to communicate with each other through the U.S. mail. Their inability to use the interoffice mail to communicate with each other does not infringe upon their First

---

[1] The court was saddened to learn of Mr. Solovy's passing in January, 2011. He was a great friend of the court and an untiring source of pro bono services.

Amendment rights. The record now also shows that the residents are not prohibited from helping each other with legal matters, mandating summary judgment on that claim as well.

As to the plaintiffs' motion for reconsideration, it is proper for the court to revisit its prior ruling in light of the plaintiffs' new arguments and evidence. However, even considering those new arguments and evidence, the court still concludes that the separation of the units is rationally related to legitimate security and logistical concerns. The plaintiffs' evidence does show that a resident's ability to interact with others has a positive effect on his rehabilitation, but the evidence does not show that the separation of the units is a decision requiring clinical input. The residents already have the opportunity for substantial interaction, even without inter-unit interaction. Alternatively, even if the decision is one that requires the exercise of clinical professional judgment, the plaintiffs' evidence does not show that separating the units is a "substantial departure from accepted professional judgment." Thus, the purported failure of Dr. Jumper to exercise his professional judgment is not independently actionable.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(1). Genuine factual disputes are resolved in the nonmovant's favor, and reasonable factual inferences are drawn in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). If the movant shows that "there is an absence of evidence to support the nonmoving party's case[,]" the nonmovant must come forth with competent, admissible evidence to demonstrate a material factual dispute for trial, not simply rest on pleadings and allegations. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); Fed. R. Civ. P. 56(c)(1)(B).

## Lurz's Access to Court Claim

For purposes of this order, Plaintiff Lurz is functionally illiterate. There is some dispute as to the extent of that disability, but inferences are drawn in Lurz's favor at this stage. The court also concludes, for purposes of this order, that Rushville does not provide any assistance to illiterate inmates to help them present grievances to the court, either by staff or by providing another resident's assistance. *See Christopher v. Harbury*, 536 U.S. 403, 413 (2002)(access to court claim might arise from denying illiterate inmate reading assistance). An illiterate resident might be shown how to log on to the computer system to conduct research on a CD-ROM, but that would be of little comfort to someone who cannot read.

Nevertheless, Lurz must still show that he suffered actual prejudice in the pursuit of a nonfrivolous claim. *Shango v. Jurich*, 965 F.2d 289 (7th Cir. 1992)("In light of the inmates' demonstrated access to the courts, the district court's finding they were not prejudiced, and Shango's citing no evidence of prejudice in the record, we must conclude that no Stateville inmate, whether literate or illiterate, presented evidence of having been prejudiced in any legal

action."). The record is against him on that score.

Lurz's dismissed habeas corpus petition was the focus of the court's prior order on summary judgment. The claim was kept in because the court could not tell if Lurz had suffered actual prejudice—the reasons for the dismissal of that habeas petition were not in the record. The Court did not address whether the access claim might be barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) as essentially a collateral attack on his confinement, a point pressed by Defendant Jumper. *See Hoard v. Reddy*, 175 F.3d 531 (7th Cir. 1999)(§1983 access claim for damages regarding defendants' alleged efforts to thwart post-conviction proceedings was barred by *Heck*, but not claim for injunctive relief to remove block to access the courts); *Nance v. Vieregge*, 147 F.3d 589 (7th Cir. 1998)(if the injury is losing the motion to withdraw guilty plea, a damages remedy would imply the invalidity of the sentence, and thus be barred by *Heck*). This thicket may be avoided since Lurz suffered no concrete injury. Lurz contends that his petition was dismissed because he filed it in the wrong court, a mistake he could have avoided with appropriate help. Yet he does not contend that the habeas petition had any merit; there is no evidence that the petition would have met a happier fate had it been filed in the correct court.[2] Additionally, Lurz already has the opportunity to challenge his commitment in the state circuit court every twelve months, proceedings in which he is entitled to an attorney. 725 ILCS 5/207(55)(a). In those proceedings, Lurz's oral motion to fire his lawyer and proceed *pro se* was denied, but he suffered no prejudice to his ability to access the courts from that decision.

The court reaches the same conclusion with regard to Lurz's habeas petition filed in 2008. That petition challenged the plaintiff's commitment on the grounds of due process, double jeopardy, ineffective assistance of counsel, and a violation of the plaintiff's purported right to a trial under the Sexually Violent Persons Act. The petition was dismissed on the grounds that the claims were not cognizable under habeas corpus, though the state judge remarked that the claims might be cognizable through some other legal process. The plaintiff contends that, had he had appropriate help, he could have pursued those claims through the appropriate legal process. Yet those claims belonged in the plaintiff's commitment proceedings, or appeals therefrom, in which the plaintiff was already represented. In any event, he does not explain how any of those claims were "potentially meritorious challenge[s]." *Marshall v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006)(right to access courts only hindered "if the defendants' conduct prejudices a potentially meritorious challenge to the prisoner's conviction, sentence or conditions of confinement.").

## Written Communication Claim

The court originally understood this claim to be one challenging a rule against all written communications between residents, even through the postal service. (Phillips Aff. ¶ 7, 51-1)("Residents are not allowed to contact each other in writing."); Jumper Aff. ¶ 20, 49-3)("Residents . . . are not permitted to contact other individuals who are being detained in other

---

[2]The plaintiff must have had help preparing this petition if he is illiterate. *See* d/e 94-1, pp. 1-6.

units."). The defendants have apparently retreated from this position and the record now shows that residents are allowed to communicate in writing to each other by using the postal service. The claim has thus been transformed into a challenge to the defendants' refusal to allow the residents to use the interoffice mail as a means of communicating with each other in writing.

It is undisputed that the residents are not permitted to use the interoffice mail to send communications to other residents. They may, however, use it to send communications to staff, and staff use it to send communications to other staff. Residents do not have their own interoffice mail in-boxes.

The plaintiffs first argue that the rule prohibiting residents from using the interoffice mail has "a direct impact on the quality of the psychological treatment residents receive—by retarding the environment in which that treatment is provided." They therefore conclude that clinical expertise must be exercised in fashioning the rule. It is undisputed that no clinical professional has weighed in on whether residents should be allowed to use the interoffice mail to communicate with each other.

In *Youngberg v. Romeo*, 457 U.S. 307, 315 (1982), the Supreme Court addressed the conditions of confinement of a mentally retarded individual who had been involuntarily committed to a state institution. The Court noted that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. at 322. The Court held that the committed individual retained liberty interests in safety, freedom from undue restraint, and "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." 457 U.S. at 319. The Court analogized to liberty restrictions on pretrial detainees, which are constitutionally acceptable for "reasons reasonably related to legitimate government objectives and not tantamount to punishment." *Id.; Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003)(persons confined as sexually dangerous persons were like pretrial detainees and could be "subjected to conditions that advance goals . . . such as preventing escape and assuring the safety of others, even though they may not be punished"). Additionally, the Supreme Court has stated that "[d]ue process requires that the conditions and duration of confinement . . . bear some reasonable relation to the purpose for which persons are committed." *Seling v. Young*, 531 U.S. 250, 265 (2001).

The Supreme Court in *Youngberg* stated that decisions by "qualified professionals" on conditions of confinement were entitled to deference by the court. Liability attaches only if "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 322. However, identifying the "qualified professional" depends on the issue to be decided. The *Youngberg* Court explained that,"[b]y 'professional' decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue." 457 U.S. at 323 n. 30.

Given the residents' ability to use the postal mail to write to each other, the plaintiffs

4

have not demonstrated that their inability to use the interoffice mail is an issue that should involve the exercise of clinical professional judgment. Their expert, Dr. Rypma, opines that Rushville's policy on written communication between residents "risk[s] impeding treatment progress" by limiting interaction which would "provide[] opportunities for emotional growth and positive psychological change." (d/e 97-17, p. 1). He opines that he sees no therapeutic reason to allow communication by the U.S. mail, but not through interoffice mail. He contends that the cost and delay of sending a letter through the mail discourages residents from interaction, thus reducing "therapeutically beneficial" interactions. Yet these conclusions are too speculative for a rational factfinder to conclude that the lack of communications through interoffice mail significantly impacts a residents' treatment. Residents are permitted to hand each other written communications and to write to each other through the U.S. mail. They may have as many written interactions as they desire. This record simply does not permit an inference that the decision must be based on the exercise of professional clinical judgment. This decision is comfortably within an administrator's expertise.

That does not end the analysis, for the decision must still be rationally related to a legitimate governmental objective. *Turner v. Safley*, 482 U.S.78, 89, 107 S.Ct. 2254, 2261 (1987)(burdens on First Amendment rights constitutional if rationally related to legitimate government interests). The objectives put forth are security and lack of resources. The defendants' security argument does not make much sense. Security threats may be communicated through the mail just as easily as through interoffice mail. Lack of resources, however, is a legitimate reason. The defendants assert that they do not have the personnel to process interoffice mail between residents. (Phillips Dep. pp. 53-54)("We're not set-up to handle inner–that much inner mail. There's no way." "There's no way we could get that through our mailroom and back out because we have enough trouble keeping up with the U.S. mail.")(McAdory Dep. p. 99, d/e 94-11)("The volume would come at such a high rate I would end up applying more manpower to manage that.").

The plaintiffs counter that this is unsupported speculation, that interoffice mail between residents could be easily processed using the existing system at no extra cost. But the defendants do not have to test their assumptions; they only have to articulate a rational reason for their actions. The reason is their fear that the interoffice system will be overwhelmed if opened up to residents, requiring the assignment of staff they do not have to deal with inspecting and delivering the interoffice mail. This concern is enough to demonstrate a "'valid, rational connection'" between limiting interoffice mail and the efficient use of staff. *Turner v. Safley*, 482 U.S. 78, 89-90 (1987). The other *Turner* factors are also satisfied. Primarily, there is a ready alternative for residents to write to each other: the U.S. mail. It may cost a stamp and take longer, but those are just insignificant inconveniences that do not burden the right itself, at least not from a constitutional perspective.

**Claim Challenging Rule against Residents Helping Each other with Legal Matters**

The record now makes clear that there is no rule against residents providing legal help to each other. Residents may speak to each other about legal matters (to the extent they come into contact with each other) and may write to each other about legal matters using the U.S. mail. This claim is thus subsumed into the written communication claim discussed above.

### Claim Challenging Lack of Unit Interaction

In a prior order the court granted summary judgment to the defendants on the plaintiffs' challenge to limits on interactions between residents on different units. The court ruled that the separation of the units is rationally related to legitimate governmental objectives of security and rehabilitation.

The plaintiffs move for reconsideration of that ruling under Fed. R. Civ. P. 54(b), citing their expert report. *See* Fed. R. Civ. P. 54(b)("any order . . . that adjudicates fewer than all the claims . . . does not end the action as to any of the claims . . . and may be revised an any time before the entry of a judgment . . . ."); *Pickett v. Prince*, 207 F.3d 402, 407 (7th Cir. 2000)("a motion to reconsider a *ruling* is constrained only by the doctrine of the law of the case. And that doctrine is highly flexible, especially when a judge is being asked to reconsider his own ruling."). Newly discovered evidence is one reason to reconsider a ruling. *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996).

When this court entered its prior summary judgment order, the plaintiffs were not represented by counsel and they had no expert to establish the therapeutic consequences of limiting resident interactions. Thus, it is appropriate for this court to revisit its prior conclusions. However, as explained below, the court reaches the same conclusions even considering the new evidence.

The relevant facts are as follows. Rushville has six separate housing units, housing a total of over 400 residents. Units A and B are adjacent to each other and house residents who refuse to participate in treatment. Units C and D are adjacent to each other, on the opposite side of the building from units A and B, and house residents who do consent to participate in treatment. Each pair of units (A/B and C/D) has its own yard area and gym. Unit E is reserved for residents with medical needs regardless of whether they are participating in treatment. Unit F is reserved for problem residents, those with chronic behavior problems.

The units currently hold about 70 to 75 residents, with a maximum capacity of 105 residents. Each unit is further divided into three pods, with about 25 residents each. Each pod has its own common area where the residents on the pod may interact. Residents on different pods in the same unit may interact during gym, yard, medication runs, art and band programs, and other scheduled recreational programs. Residents are locked in their rooms from 10:00 p.m. to 7:15 a.m. According to the plaintiffs, they spend the bulk of their waking hours confined to their pod, with about one to three hours of daily interaction with the residents on other pods in their unit.

At the time this suit was filed, the residents were not housed according to whether they consented to treatment. That change was made sometime in 2010, per the recommendation of Defendant Jumper, the Clinical Director. Defendant Mcadory, the Security Director, testified that, according to his understanding, the purpose of the change was to house residents together who shared the common goal of rehabilitation through treatment, and to minimize contact with the possibly negative influences from residents who had refused treatment. (McAdory Dep. p. 25, d/e 94-11). McAdory initially thought the change was ill-advised from a security point of view, but he came around when he observed that the change appeared to result in fewer incidents of aggression involving the residents in treatment. *Id.* at 29.

A rooming committee makes recommendations regarding to which pod a resident should be assigned. The recommendation is based on many different variables, including a resident's request, his personality, his disciplinary history, his compatibility with other residents, his medical issues, other clinical considerations regarding the resident, and space availability. The rooming committee is typically comprised of clinical and security staff. The facility's medical director and the security director have the final say on whether to accept the rooming committee's recommendation.

Residents on different units have limited opportunities for interaction. In general, units A and B are kept separate from units C and D. Units A and B interact for two hours at yard on the weekends, as do units C and D. The yards are outdoor areas with concrete and grass divided into four sections that can be separated by gates. The yard for units A and B is on the opposite side of the building from the yard for units C and D. (McAdory Dep. p. 44).

The only opportunities for residents on units A and B to personally interact with residents on units C or D is, according to the plaintiffs, about four to five times a year when special events are planned. Interaction may also occur by chance if the residents are in the same treatment groups, if they happen to be one of the 24 residents who attend movie night once or twice a month, if they work together on job assignments, or if they are transported together for outside appointments. (d/e 97-18; Jumper Dep. p. 31, d/e 94-13). In general, however, there is little personal interaction between residents on different units.

When the residents were first moved from the Joliet facility to the Rushville facility in May 2006, the clinical staff asked McAdory to mix up the units during yard time, in order to allow for more interaction between a wider swath of residents, the way it had been done at the Joliet facility. (McAdory Dep. p. 46). At the Joliet facility, residents were able to more freely interact. McAdory testified that he vetoed this idea because he wanted to minimize potential security problems such as fighting, sexual acting-out and staff assaults. *Id.* at 51. In his opinion, the way to do that was to capitalize on the facility's physical structure (division of the pods and units) in order to decrease the interaction between the residents. Most of McAdory's experience before working at the Rushville facility involved prison security. McAdory testified that, at the time he vetoed the clinical staff's request for more interaction between the units, he was the shift commander and the clinical staff could have taken the issue to the security director at the time, but no one did. *Id.* He testified, "I simply explained my point of view and they seemed to accept

7

it." *Id.* at 52. He also testified that, even though he is now the Security Director, the clinical staff can still go over his head to the Director of the facility to protest his decision, but this has never happened. (McAdory Dep. p. 74).

It is undisputed that Dr. Jumper does not have input on the interaction between the units or the movement of the residents in general. (Jumper Aff. p. 30). He views those decisions as within the purview of the administrators and security personnel, that "the operational needs of the facility would supercede" any clinical input on the matters. *Id.* at pp. 30, 65. He also testified that the "security and safety of the facility is an overall guiding principal in all of the decisions that are made. . . . I mean, in order to have, for example, a clinical or a therapeutic milieu environment it has to be safe." *Id.* p. 69.

The plaintiff's expert, Dr. Craig Rypma, has a Ph.D. in clinical psychology from the University of Maryland. From 1988 to June 2007, Dr. Rypma provided consultation services to parole staff "regarding management and treatment of convicted sex offenders" and conducted evaluations of and implemented a treatment program for those offenders. (d/e 97-17, curriculum vitae). He has also given presentations on sex offender treatment and evaluations. According to his expert report, he has been found qualified to testify as an expert regarding sexually violent persons in cases in several states. In preparation for his report, he personally interviewed the plaintiffs at Rushville and reviewed relevant documents.

Dr. Rypma's report states that "[i]nteraction between and among SVP residents provides opportunities for emotional growth and positive psychological change for the residents themselves, as well as treatment opportunities for staff to promote the kind of healthy interaction that is required for eventual release." (d/e 97-17, ¶ 3). He opines that "[c]ontact among residents in an SVP treatment facility is critical to therapeutic progress, as recognized by the numerous treatment facilities of which I am aware that allow far greater contact than Rushville." *Id.* p. 3. He believes that the security reasons proferred for keeping the units separate is "misguided," based more on McAdory's experience in prison security than on the security needs in a treatment facility. Dr. Rypma contends that the separation of the units is an overreaction to security concerns which could be less radically addressed by isolating particular residents from each other. Dr. Rypma asserts that he has personally visited SVP facilities in five different states, each having a more liberal resident interaction policy than Rushville. His report states:

> Again, one must note that one of the most important parts of treatment of sexually violent persons is teaching how to properly socialize with other people; many pedophiles suffer from a disorder that impedes their ability to understand and adhere to social norms regarding appropriate contact among people, not limited to appropriate contact with children. Thus, interaction among residents, when appropriately monitored, is critical to treatment success because it is in that environment in which residents can learn how to properly interact with people.

*Id.* p. 4. He contends that "[d]irect contact among residents in SVP treatment facilities is the norm in my professional experience. It is critical that residents be allowed to interact with each

8

other, always with appropriate monitoring to alleviate security concerns, so that those residents can learn appropriate social interaction." *Id.* p. 5. Dr. Rypma concludes that "it is the opinion of this evaluator that the current policies and practices which limit direct contact and oral and written communication between and among residents at Rushville **DO NOT** promote acceptable treatment progress, and therefore may limit a resident's ability to achieve their treatment goals in a timely manner." (d/e 97-17, p. 7)(emphasis in original).

The plaintiffs seek only injunctive relief. They argue that the decision to restrict inter-unit interaction is a decision that implicates their clinical rehabilitation, therefore requiring the exercise of clinical professional judgment. Since it is undisputed that Dr. Jumper played no part in the decision, the plaintiffs ask that he be ordered to do so.

> Detainees are entitled to "the exercise of professional judgment as to the needs of residents". . . . . *Seling v. Young*, 531 U.S. 250, 265, 121 S.Ct. 727, 148 L.Ed.2d 734 (2001), generalizes the proposition this way: "due process requires that the conditions and duration of confinement ... bear some reasonable relation to the purpose for which persons are committed."

*West v. Schwebke*, 333 F.3d 745 (7th Cir. 2003). "'[T]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.'" *Youngberg*, 457 U.S. at 322, *quoting with approval Romeo v. Youngberg*, 644 F.2d 147, 178 (1980), *reversed by Youngberg on other grounds.*.

The "professional judgment" standard does not mean that a clinical professional must participate in every decision on how to run a state treatment facility. As discussed above, the "professional judgment" required depends on the decision being made. *Youngberg*, 457 U.S. at 323 n. 30 ("[b]y 'professional' decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue.").

Here, the plaintiffs have demonstrated that a resident's ability to interact with others is important to his rehabilitation. It is through those interactions, both positive and negative, that a resident learns the communication and coping skills that he will need in the community. But the residents at Rushville already have many opportunities for personal interaction. They may interact with 24 other residents on their pod, an additional 50 residents on their unit, and another 75 residents from a different unit on weekends. That is about 150 residents with whom a resident has regular opportunities for interaction. The residents may also interact with each other through job assignments, group treatment, structured recreational and fine arts activities, transports, and special events. And, the residents have opportunities to interact with the many staff that work at the facility and may receive visits from approved family and friends.

In light of these significant interaction opportunities, the plaintiffs have not demonstrated how the decision to keep units A/B and C/D separated implicates their rehabilitation or treatment. In other words, they have not shown that clinical professional judgment should play a

9

part in the decision. Dr. Jumper essentially confirms this conclusion. He testified that the decision on unit movement and interaction was one for security and administrators, not clinicians. These residents are not experiencing the kind of isolation in *West v. Schwebke*, 333 F.3d 745, 747 (7th Cir. 2003), which the plaintiffs' experts described as "medically inappropriate and universally condemned by the psychiatric profession . . . ." And, even if the decision did require the exercise of professional clinical judgment, it seems to the court that Dr. Jumper *did* exercise that judgment by not intervening. Dr. Jumper, in his professional judgment, decided it was an issue for security, not the therapists.

Alternatively, even Dr. Jumper was required to and failed to exercise his professional judgment in the unit-interaction decision, the decision itself is not a "substantial departure from accepted professional standards." *Youngberg*, 457 U.S. at 322. It may be that allowing more unit interaction would be beneficial for rehabilitation. That inference is plausible drawn from Dr. Rypma's report, which concludes the more interaction the better. But Dr. Rypma does not analyze the residents' interaction opportunities that do exist, nor does he conclude that those opportunities are insufficient from a clinical perspective. The other facilities that Dr. Rypma has visited may be better than Rushville from a clinical perspective, but the constitutional standard is a floor, not a ceiling. In sum, the argued failure of Dr. Jumper to exercise his professional judgment is not actionable, since the decision itself does not violate any of the residents' constitutional rights.

The plaintiffs also contend that the separation of the units is not rationally related to a legitimate security concern. The court is still of the opinion, though, that the separation is rationally related to the legitimate security goal of decreasing opportunities for residents to manipulate or harm each other, and also rationally related to the legitimate goal of efficient use of staff. The separation is also supported by the legitimate goal of limiting the possible negative influence that a resident who refuses treatment might have on a resident who is trying to complete treatment. Thus, McAdory's decision withstands constitutional scrutiny even in light of the plaintiffs' new arguments and evidence.

IT IS THEREFORE ORDERED:

1) The defendants' motions for summary judgment are granted (d/e's 94, 95).

2) The plaintiffs' motion for reconsideration and summary judgment (d/e 97) is granted in part and denied in part. The motion is granted to the extent the plaintiffs ask the court to revisit its prior summary judgment order in light of their new evidence and arguments. However, the court has reconsidered that order and still reaches the same conclusions. Accordingly, the plaintiffs' motion is denied to the extent it seeks summary judgment on their claims.

3) The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiffs. All other pending motions are denied as moot and this case is terminated, with the parties to bear their own costs. The plaintiffs' attorneys

may seek reimbursement from the district court fund pursuant to the district court fund plan, which can be found on the district's website.

4) Pro bono counsel is discharged. The court extends its heartfelt gratitude and appreciation for counsel's superlative advocacy on the plaintiffs' behalf. The plaintiffs proceed pro se from this point.

5) If a plaintiff wishes to appeal this judgment, he must file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). The plaintiffs are now proceeding pro se and thus it is the plaintiffs' responsibility to file the notice of appeal if they so desire. A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C).

Entered this 19th Day of September, 2011.

\s\**Harold A. Baker**

HAROLD A. BAKER
UNITED STATES DISTRICT JUDGE